UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------------X

SHAHID WOODSTOCK, JAHIEM SMITH, and TIFFANIE
NARINESAMMY,

                                        Plaintiffs,

                    -against-

THE CITY OF NEW YORK, MAYOR OF THE CITY OF NEW
YORK ERIC ADAMS, DEPUTY MAYOR OF PUBLIC SAFETY
PHILIP BANKS III, NYPD COMMISSIONER KEECHANT
SEWELL, NYPD COMMISSIONER EDWARD CABAN, NYPD
CHIEF OF DEPARTMENT JEFFREY MADDREY, NYPD
DEPUTY CHIEF MILTIADIS MARMARA, NYPD CHIEF OF
PATROL JOHN CHELL,  NYPD CAPTAIN JOHN DASARO
(TAX ID 948198), NYPD DETECTIVE PEDRO ROMERO
(BADGE # 7348, TAX ID 934130), NYPD DETECTIVE
NICHOLAS GIGANTE (BADGE # 1729, TAX ID 949025), NYPD
DETECTIVE JAMES MCDERMOTT (BADGE # 7348, TAX ID
934130), NYPD PO DAVID BARKER (BADGE # 13845, TAX ID
926545), NYPD PO VICTOR ROBLES (BADGE # 15677, TAX ID
957087), NYPD PO RANDY PAULSAINT (BADGE # 17773, TAX
ID 951022), NYPD SERGEANT MELVIN CLARKE (BADGE #
1380, TAX ID 955822), NYPD SUPERVISOR DOES # 1 – 20,
NYPD MEMBER DOES # 1 – 20, CITY POLICYMAKERS JOHN
OR JANE ROE # 1 – 5, NEW YORK CITY HEALTH AND
HOSPITALS CORP., AND NYCHHC DOES # 1 – 5,

                                        Defendants.

 --------------------------------------------------------------------------------X

**VERIFIED
COMPLAINT**

Index No.:

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

Plaintiffs, SHAHID WOODSTOCK, JAHIEM SMITH, and TIFFANIE

NARINESAMMY, by their attorneys, KAISHIAN & MORTAZAVI LLC, by MARYANNE K.

KAISHIAN, ESQ., an attorney duly licensed to practice before the United States District Court

for the Eastern District of New York, hereby complain of Defendants as follows:

**PRELIMINARY STATEMENT**

1.      On September 29, 2022, Plaintiff Shahid Woodstock ("Plaintiff" or "Mr.

Woodstock"), a 22-year-old resident of Kings County, was lawfully present on a public sidewalk

in Kings County, City and State of New York, when he was unlawfully pursued and shot from behind in the leg by Defendant Police Officer David Barker. Defendant Barker fired at least one additional shot, striking a doorframe near Mr. Woodstock's head. At the time of the shooting, Defendant Barker was assigned to an NYPD mayoral security detail.

2.      Mr. Woodstock, who was already entering the apartment building, located at 18 Patchen Avenue, Brooklyn, New York, where he was residing at the time of the shooting, entered the building and collapsed to the floor, bleeding profusely from the gunshot wound. Plaintiff Jahiem Smith ("Plaintiff" or "Mr. Smith"), then 18 years old and an overnight guest at the apartment, was inside the first-floor residence, Apt 1F, with his girlfriend, Plaintiff Tiffanie Narinesammy, who was 18 years old and approximately 20 weeks pregnant at that time. Mr. Smith came to Mr. Woodstock's aid.[1]

3.      Mr. Smith attempted to apply pressure to the wound while Mr. Woodstock shouted at Mr. Smith to get back inside the apartment and find cover to protect himself and Ms. Narinesmith. Mr. Woodstock was unaware why he had been shot or by whom, and he feared for Mr. Smith and Ms. Narinesammy's safety.

4.      Defendant NYPD members then broke down the lobby door, pointed guns at the Plaintiffs, threatened them, and dragged Plaintiff Woodstock, who was unable to walk, through broken glass and out of the building.

5.      Shortly after the shooting, high-ranking NYPD officials mobilized to violate Plaintiffs' civil rights to protect Defendant Barker and shield Defendants, including Defendant Mayor Adams, from scrutiny.

---

[1] The two Plaintiffs were raised by family members as siblings and refer to each other as brothers, though they are not legally or biologically siblings.

6.      In furtherance of this conspiracy, NYPD members arrested all Plaintiffs without probable cause to do so.

7.      Defendant NYPD members transported Mr. Smith and Ms. Narinesammy, both barefoot, to the 81st Precinct, where they would remain for more than 24 hours without being charged with any crimes.

8.      Defendant NYPD members initially transported Mr. Woodstock to Kings County Hospital in the same ambulance as Defendant Barker, who claimed to suffer from tinnitus.

9.      Mr. Woodstock was present in the hospital for approximately two (2) hours while shackled to a hospital bed.

10.      Mr. Woodstock was discharged wearing only a hospital gown and still in NYPD custody. Defendants transported him to the 81st Precinct in Kings County.

11.      Defendants falsely asserted Mr. Woodstock matched the description of a person wanted for a non-fatal shooting that occurred in the nearby 83rd Precinct.

12.      However, it was readily apparent and known to Defendants that Mr. Woodstock had not been involved in that incident. The alleged shooter in that matter had been placed under arrest by NYPD members at the scene of that shooting while still in possession of a gun, and a person of interest who may have fled the scene was described as wearing a distinctive orange or pink sweatshirt. When Defendants Barker and Robles pursued and shot Mr. Woodstock, he was wearing a black jacket and white tee shirt.

13.      While Plaintiffs remained in custody, Defendants attempted to retroactively construct an alternative explanation for Defendants' unlawful pursuit and for Defendant Barker's excessive and unreasonable use of deadly force against Mr. Woodstock, and for Defendants' arrest of all Plaintiffs at 18 Patchen Ave.

14.     On September 30, 2022, Defendant Pedro Romero (Badge # 7348) of the Force Investigation Division knowingly presented false information and/or misrepresented information to Judge Vincent del Giudice in Kings County to procure a search warrant for 18 Patchen, Apt 1F.

15.     During the execution, Defendants allegedly located two firearms inside the home and charged Mr. Smith with Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03). The Arrest Report, executed by members of the Force Investigation Division, lists the time of arrest as 14:45 on September 30, 2022. Mr. Woodstock was not charged with any offense related to September 29, 2022.

16.     Mr. Woodstock would remain in police custody until his arraignment on or about October 1, 2022. He was incarcerated pretrial at Rikers Island in this matter until his family posted bond on or about October 9, 2022.

17.     Defendants caused severe physical and emotional injuries to Plaintiffs.

18.     Plaintiffs now bring the instant case before this Court.

## PARTIES

19.     **PLAINTIFF SHAHID WOODSTOCK** ("Mr. Woodstock" or "Plaintiff Woodstock"), at all relevant times, was a resident of Brooklyn, Kings County, City and State of New York. Mr. Woodstock is currently incarcerated in DOCCS custody at Cayuga Correctional Facility in New York State. At the time of his arrest by Defendants he was 22 years old and had no criminal convictions.

20.     **PLAINTIFF JAHIEM SMITH** ("Mr. Smith" or "Plaintiff Smith") is, and was at all relevant times, was a resident of Brooklyn, Kings County, City and State of New York. At the time of his arrest by Defendants he was 18 years old and had no criminal convictions.

21.     **PLAINTIFF TIFFANIE NARINESAMMY** ("Ms. Narinesammy" or "Plaintiff Narinesammy") is, and was at all relevant times, a resident of the State of New Jersey. At the time of his arrest by Defendants she was 18 years old and had no criminal convictions.

22.     At all relevant times mentioned herein, **DEFENDANT CITY OF NEW YORK ("Defendant City" or "New York City")**, was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees, and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

23.     **DEFENDANT NEW YORK CITY MAYOR ERIC ADAMS ("Defendant Adams")** was at all times relevant to this Complaint the Mayor of New York City. As Mayor, Defendant Adams, at all relevant times, was an elected officer and the "chief executive officer of the city," New York City Charter § 3, and had final authority to appoint and/or remove any NYPD employees and agents, including the New York City Police Commissioner. As Mayor, Defendant Adams may, with the consent of the district attorney, also increase or decrease the number of positions within the district attorney's office. New York County Law § 931. Defendant Adams is further responsible for the assignment of special security details to Defendant City's executive officers or other officials and with directly issuing orders to individuals assigned to his security detail. Defendant Adams is a policymaker for whom the City is liable. He is sued individually and in his official capacity.

24.     **DEFENDANT FORMER NYPD COMMISSIONER KEECHANT SEWELL ("Defendant Sewell")** was, at all times relevant to this Complaint through June 12, 2023, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Sewell, personally and/or through her authorized delegates, at all relevant times had final authority to promulgate and

implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. She is sued individually and in her official capacity.

25.    **DEFENDANT NYPD COMMISSIONER EDWARD CABAN ("Defendant Caban")** is, was at all times relevant to this Complaint after June 12, 2023, the Police Commissioner of the NYPD. At all relevant times prior to June 12, 2023, Defendant Caban was the NYPD's First Deputy Commissioner. As Police Commissioner, Defendant Caban, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. As First Deputy Commissioner, Defendant Caban held these same responsibilities and answered only to the Police Commissioner, then Defendant Sewell, and the Mayor, Defendant Mayor Adams. As First Deputy Commissioner, Defendant Caban was also responsible for directing, evaluating, and receiving ongoing reports regarding Force Investigation Division operations, and for supervising and making determinations regarding the same.  He is sued individually and in his official capacity.

26.    **DEFENDANT NYPD CHIEF OF DEPARTMENT JEFFREY MADDREY ("Defendant Maddrey")** was at all times relevant to this Complaint the Chief of Department of the NYPD who had policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Maddrey had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD

uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

27.     **DEFENDANT NYPD CHIEF OF PATROL JOHN CHELL ("Defendant Chell")** was at all times relevant to this Complaint prior to December 2, 2022, the Deputy Chief of Patrol of the NYPD who had policymaking authority over the Department after the Chief of Patrol. At all relevant times, as Deputy Chief of Patrol, Defendant Chell had primary responsibility for NYPD patrol operations, particularly operations involving stops of civilians on public streets, including stops conducted while on foot and and/or while operating vehicles. NYPD uniformed members of the service were obligated to obey any lawful order given by Defendant Chell. He is sued individually and in his official capacity. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him, and he constitutes a policymaker for Defendant City. He is sued individually and in his official capacity.

28.     **DEFENDANT DEPUTY MAYOR OF PUBLIC SAFETY PHIL BANKS III ("Defendant Banks")** was at all relevant times the Deputy Mayor of Public Safety for the City of New York. As Deputy Mayor, Defendant Banks was responsible for creating and implementing policies affecting public safety. By Summer 2022, and through the time of the conduct giving rise to the instant Complaint, Defendant Banks was responsible for the operations of the City's Office of Municipal Services Assessment, officially created by Executive Order by Mayor Adams in 2023, and was responsible for gathering information, creating policies, influencing staffing decisions, and otherwise directing operations within the NYPD's Municipal Security Section. Defendant Banks received reports directly from Defendant NYPD Deputy Chief Miltiadis

Marmara and advised on operations within the NYPD's MSS, and advised Mayor Adams regarding the same. Defendant Banks constitutes a policymaker for whom the City is liable.

29.     **DEFENDANT NYPD DEPUTY CHIEF MILTIADIS MARMARA (Tax ID 902729) ("Defendant Marmara")** at all relevant times was a Deputy Chief with the NYPD. In 2022, and at the time of the conduct complained of herein, Defendant Marmara was assigned within the NYPD to oversee the Muncipal Security Section and was a supervisor and policymaker responsible for training, supervising, implementing policies, making personnel decisions, and other high-level responsibilities within the unit. By 2023 Executive Order, Marmara was charged by Defendant Mayor Adams to ensure "the delivery of services to the public and other key stakeholders [and] to ensure that services are delivered in a professional, equitable, efficient and effective manner" as part of the Municipal Services Assessment. However, Defendant Marmara's role began in Summer 2022, while he remained with the Municipal Security Section, and continued through the events giving rise to this Complaint until April 2023.[2] In this role, which appears to have constituted hybrid employment by the NYPD and directly by the City and Adams Administration with the Office of Municipal Services Assessment, Defendant Marmara was responsible for overseeing the members and operations of Municipal Security Section, implementing policies, and reporting his findings and recommendations directly to Deputy Mayor Philip Banks III and Defendant Mayor Adams. At all times, Defendant Marmara was a Defendant City agent and/or policymaker for whom Defendant City is liable. He is sued individually and in his official capacity.

---

[2] *See* Joe Anuto, *Adams quietly creates new offices, empowering low-profile deputy mayor*, POLITICO, Feb 13, 2023, *available at* https://www.politico.com/news/2023/02/13/adams-quietly-creates-new-offices-empowering-low-profile-deputy-mayor-00082485; *see also Ludemann v City of New York et al*. (152601/2024) (New York County).

30. **DEFENDANT DEPUTY INSPECTOR OF MUNICIPAL SECURITY MELODY ROBINSON (Tax ID 939329) ("Defendant Robinson")** was at all relevant times the Deputy Inspector of Municipal Security for the NYPD, which includes oversight of the specialized details assigned to mayoral security. Individuals assigned to these details are members of the Uniformed Operations Unit and/or Executive Operations Unit of the NYPD Intelligence Bureau. At the time of the shooting, and according to NYPD records, Defendants Barker and Robles are members of the NYPD's Uniformed Operations Unit and were supervised by Defendant Robinson. Defendant Robinson, personally and/or through her authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures over these units, including by working closely with Defendant Mayor Adams and/or executives within his Administration, including by implementing and/or enforcing and/or supervising policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties while on assignment in security details for the Mayor and other City officials, and constituted a City policymaker for whom the City is liable. She is sued individually and in her official capacity.

31. **DEFENDANT NYPD POLICE OFFICERS DAVID BARKER (Badge # 13845, Tax ID 926545) ("Defendant Barker") and VICTOR ROBLES (Badge # 15677, Tax ID 957087) ("Defendant Robles")** were employed by the City of New York as police officers and/or members of the NYPD and were acting within the scope of their employment at the time of the incidents giving rise to this Complaint. At the time of the incident, Defendants Robles and Barker were assigned to the Municipal Security Section's Uniformed Operations Unit. They are sued individually and in their official capacity.

32.     **DEFENDANT DEPUTY CHIEF OF DEPARTMENT ANTHONY MARINO (Tax ID 935250) ("Defendant Marino")** at all times relevant to this Complaint, was the Inspector of the Force Investigation Division (FID) prior to his promotion to Deputy Chief. As Inspector of FID, Defendant Marino was responsible for supervising, training, and disciplining members of the FID under his supervision, and for implementing policies and procedures of the NYPD and Defendant City as well as making day-to-day operating and personnel decisions, including promotions. Defendant Marino was responsible for overseeing the proper execution of mandatory FID reports and/or inspections and/or investigations and/or evidence collection in the wake of a firearm discharge by a member of the NYPD, as well as for ensuring the creation, accurate completion, and appropriate reporting of records generated and determinations concerning the same. Defendant Marino was further responsible for reporting the findings of investigations conducted by FID and/or his supervisees to the First Deputy Commissioner, who at the time of the shooting at issue was Defendant Caban, and who in turn was tasked with reporting to the Police Commissioner, Defendant Keechant Sewell, and the Mayor, Defendant Mayor Adams. At the time of the events giving rise to this Complaint, Defendant Marino was operating within the scope of his employment as a supervisor with the NYPD. Defendant Marino is sued individually and in his official capacity.

33.     **DEFENDANT CAPTAIN JOHN DASARO ("Defendant Dasaro")** was at all times relevant to this Complaint was a Lieutenant and supervisor within the Force Investigation Division prior to his promotion to Captain. As such, he was responsible for supervising, conducting, making determinations, and issuing reports related to investigations of firearm discharges and other uses of force by NYPD members. Defendant Dasaro was responsible for supervising and/or participating in the completion of mandatory FID reports and/or inspections

and/or investigations and/or evidence collection in the immediate wake and aftermath of a firearm discharge by a member of the NYPD, as well as for ensuring the creation, accurate completion, and appropriate reporting of records generated and determinations concerning the same. As supervisor within the FID, he was responsible for recommending determinations and findings to the Inspector and First Deputy Commissioner, for supervising day-to-day practices of all FID members, and for implementing departmental policies and practices within the unit within his control. He is sued individually and in his official capacity.

34.     **DEFENDANTS NYPD DETECTIVE PEDRO ROMERO (Badge # 7348, Tax ID 934130) ("Defendant Romero"), NYPD DETECTIVE NICHOLAS GIGANTE (Badge # 1729, Tax ID 949025) ("Defendant Gigante"), and NYPD DETECTIVE JAMES MCDERMOTT (Badge # 7348, Tax ID 934130) ("Defendant McDermott"),** collectively "Defendant Detectives**,"** at all relevant times, were Detectives assigned to the NYPD's Force Investigation Division and employed by the City of New York. Defendant Detectives were acting within the scope of their employment at the time of the incidents giving rise to this Complaint. As Detectives with FID, Defendant Detectives were responsible for investigations related to firearm discharges and other uses of force by NYPD members. Defendants were responsible for completing mandatory FID reports and/or inspections and/or investigations and/or evidence collection in the wake of a firearm discharge by a member of the NYPD, as well as for ensuring the creation, accurate completion, and appropriate reporting of records generated and determinations concerning the same. They are sued individually and in their official capacity.

35.     **DEFENDANT SERGEANT MELVIN CLARKE (Badge # 1380, Tax ID 955822) ("Defendant Clarke")** was at all relevant times the NYPD sergeant supervising the NYPD's 81st Precinct in Kings County, including on September 29, 2022. As sergeant supervising

the 81ˢᵗ Precinct, Defendant Clarke was responsible for supervising and/or training NYPD members in his precinct and for supervising the conduct of NYPD members operating within his precinct, including during arrests and/or interrogations occurring within the 81ˢᵗ Precinct building, and for endorsing and/or approving reports generated in relation thereto. He is sued individually and in their official capacity.

36.     **DEFENDANT POLICE OFFICER RANDY PAULSAINT (Badge # 17773, Tax ID 951022) ("Defendant Paulsaint")** was at all relevant times a police officer assigned to the NYPD's Strategic Response Group. Defendant Paulsaint was acting within the scope of his employment at the time of the incidents giving rise to this Complaint. He is sued individually and in his official capacity.

37.     The true names and identities of **DEFENDANT NYPD OFFICERS JOHN OR JANE DOE # 1 – 20 ("Defendant NYPD Officer Does")** are not currently known, and they are referred to collectively by the fictitious placeholder "Defendant NYPD Officer Does." Defendant NYPD Officer Does were employed by the City of New York as police officers within the NYPD and were acting within the scope of their employment at the time of the incidents giving rise to this Complaint. They are sued individually and in their official capacity.

38.     The true names and identities of **DEFENDANT NYPD SUPERVISORS JOHN OR JANE DOE # 1 – 20 ("Defendant NYPD Supervisor Does")** are not currently known, and they are referred to collectively by the fictitious placeholder "Defendant NYPD Supervisor Does." Defendant NYPD Supervisor Does were employed by the City of New York as members and supervisors within the NYPD and were acting within the scope of their employment at the time of the incidents giving rise to this Complaint. As supervisors, in addition to their own duties as NYPD members, Defendant NYPD Supervisor Does were responsible for training, supervising,

correcting, and reporting the behavior of subordinates within the Department, as well as with implementing policies, practices, and directives issued within the NYPD. Subordinate officers are required to follow the commands and instructions of NYPD supervisors. They are sued individually and in their official capacity.

39.     The true names and identities of **DEFENDANT CITY POLICYMAKERS JOHN OR JANE ROE # 1 – 5** ("Defendant Policymaker Roes") personally and/or through her authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. She is sued individually and in her official capacity.

40.     **DEFENDANT NEW YORK CITY HEALTH AND HOSPITALS CORP. ("Defendant NYCHHC")** is a municipal corporation organized within Defendant City and responsible for administering hospitals and healthcare providers including Kings County Hospital, where Plaintiff Woodstock was treated for a gunshot wound inflicted by Defendant Barker. Defendant NYCHHC employs, supervises, trains, and disciplines medical personnel and staff and is responsible for the administration, oversight, and application of medical care to patients at these facilities. The true identities of Defendant NYCHHC employees and/or agents **NYCCH EMPLOYEES JOHN OR JANE DOE # 1 – 5 ("Defendant NYCHHC Does")** are not yet known, and they are referred to fictitiously herein. Defendant NYCHHC Does were acting within the scope of their employment at the time of the incidents giving rise to this Complaint. They are sued individually and in their official capacity.

41.     At all times hereinafter mentioned, all individual Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

42.     Each and every act and omission by the individual Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

43.     The individual Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

44.     All Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

45.     At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

46.     Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendant NYPD Members, or any other member of the NYPD, take any steps to intervene in, the abusive and/or constitutionally and legally deficient conduct of their colleagues.

47.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

48.     Each individual Defendant is sued in her or his individual and official capacities.

## JURISDICTION AND CONDITIONS PRECEDENT

49.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, including 1367(a), and 1441, and 42 U.S.C. § 1983.

50.     Venue is proper pursuant to 28 U.S.C. § 1391, *et seq.*, in the Eastern District of New York, where the actions complained of herein occurred.

51.     The monetary damages amount sought by Plaintiff exceeds $150,000.00.

52.     Plaintiffs Woodstock and Smith retained counsel more than ninety (90) days after the incident. Counsel timely submitted a Petition for a Late Notice of Claim pursuant to New York State General Municipal Law (GML) § 50-E on September 13, 2023, in Kings County Supreme Court. *In Re Woodstock* (526483/2023) (Kings Co.).

53.     The Petition was granted by Hon. Judge Frias-Colon in Kings County on April 25, 2024, and the Notices of Claim previously filed upon Defendants City and NYCHHC by Plaintiffs Woodstock and Smith deemed timely filed *nunc pro tunc*.[3]

54.     Plaintiffs Woodstock and Smith each submitted to examinations pursuant to GML § 50-E.

55.     Plaintiff Jahiem Smith was examined on December 15, 2023.

---

[3] The decision has not yet been provided a docket file number. Plaintiffs Smith and Narinesammy do not bring claims against Defendant NYCHHC.

56.     Plaintiff Woodstock also appeared for examination on December 15, 2023. Defense Counsel and Plaintiffs' Counsel were both present via video.

57.     However, the New York State DOCCS facility's video system was inoperable and could not proceed due to circumstances outside Plaintiff's control.

58.     The parties agree as to the cause of this cancellation. The parties agreed to reschedule the examination, but a date has not yet been provided by the City. Plaintiff Woodstock was and remains ready and willing to testify and has otherwise complied with his obligations pursuant to the GML to date.

59.     At least thirty (30) days have elapsed since service of Plaintiffs' Notices of Claim and adjustment and payment thereof has been neglected or refused.

60.     Plaintiff Narinesammy did not file a Notice of Claim and was not included in the Petition for Late Notice of Claim. Nevertheless, Plaintiff Narinesammy's New York State claims are all filed within two years of the incidents giving rise to this Complaint and are therefore timely under the public interest exception, as she is seeking policy change in addition to monetary damages.

61.     This action has been initiated within all applicable statutes of limitation.

## BACKGROUND

### *NYPD Security Details*

62.     The Mayor of New York City is afforded a security detail consisting of members of the NYPD. The Mayor, as the head of the NYPD, has final say over these assignments, in addition to possessing the ability to award security detail privileges to other City executives and/or to selected individuals within the Administration.

63.     The NYPD's Intelligence Bureau houses the Municipal Security Section (MSS), which has two primary units from which these security details are staffed: the Executive Protection Unit (EPU) and the UOU.

64.     The EPU primarily staffs details travelling with the Mayor, and NYPD members in these details have irregular tour schedules. The UOU is generally assigned to provide security to the Mayor and/or his family and/or other City executives at sensitive locations, including Gracie Mansion. However, given the overlapping responsibilities and supervision, it is not unusual for staff from one unit to be assigned to a post that would more typically fall under the other's purview.

65.     At the time of the shooting, Defendants Barker and Robles were members of the NYPD's UOU.

66.     At this time, Defendant Deputy Chief Miltiadis Marmara was responsible for overseeing MSS and its units, including UOU. In January 2022, Mayor Adams appointed Defendant Melody Robinson to the position of Deputy Inspector, placing her in charge of security detail assignments, personnel decisions, training, supervision, and day-to-day operations for NYPD members in these units, and making Defendant Robinson responsible for reporting to the Deputy Chief.

67.     Upon information and belief, by September 2022, Defendant Marmara was occupying a dual role as NYPD Deputy Chief and as-yet unofficial head of Defendant Adams' Office of Municipal Services Assessment, solidifying a direct line of communication between the NYPD's MSS and City Hall, and reporting directly to Defendants Banks and Adams.

68.     Defendant Mayor Adams and other municipal policymaker officials for Defendant City have also consistently implemented policies and practices to ensure extensive, direct

involvement by the Mayor and the Administration in the day-to-day operations of the NYPD's Intelligence Bureau, MSS, and the NYPD security details during Mayor Adams' tenure.

69.     In January 2022, Mayor Adams appointed his brother, Bernard Adams, also a former NYPD member, to a civilian position as the Senior Security Advisor to the Mayor.

70.     In a press briefing held on October 3, 2022, just four days after a member of an Intelligence Bureau and MSS security detail shot Mr. Woodstock, Mayor Adams fielded a question about the alleged assignment of an NYPD security detail to Defendant Banks.[4] When asked by a member of the media whether the NYPD Intelligence Bureau had greenlit such an assignment, Mayor Adams replied, "I am the Intelligence Bureau."[5]

71.     The Mayor continued: "I decide what I need in my agencies to get the job done. I sit down with all of my agencies and make a determination what tools we need. Everyone falls under the team concept. And if you would speak to [NYPD] Intel, Intel would tell you that we advise the Mayor, but the Mayor makes a determination on what we are going to do to properly keep this city safe. I'm obligated to do so, and I'm sure they will agree that having a well-trained police officer be on the front line of responding to these issues is a smart way to do it and it's a unique way to do it."[6]

72.     The following year, in February 2023, Defendant Bernard Adams confirmed the Mayor's direct involvement in NYPD security detail assignments and activities. Reflecting on his year in the role, Defendant Bernard Adams stated, "The detail that [Mayor Adams] has, we

---

[4] Official Website of the Mayor of New York, Transcript: Mayor Adams Makes an Announcement, Oct. 3, 2022, *transcript available at*:  https://www.nyc.gov/offi ce-of-the-mayor/news/717-22/transcript-mayor-eric-adams-fi rst-in-nation-street-deliveristas-hubs-serve-nyc-s-food (last visited May 3, 2024).
[5] *Id*.
[6] *Id*.

handpicked everybody in that detail, great bunch of men and women professionals. They know what they're doing."[7]

73.     Upon information and belief, Defendant City's policymakers, including Defendant Mayor Adams, were aware of and/or directed the day-to-day activities of the security detail, and further approved and/or supervised and/or failed to mitigate the actions undertaken by Defendants complained of herein.

## STATEMENT OF FACTS

### *September 29, 2022*

74.     On September 29, 2022, a non-fatal shooting occurred at approximately 09:30 PM at or near the intersection of Kosciuszko St. and Broadway within the confines of the 83rd Precinct in Kings County, resulting in a significant police response from members of the NYPD.

75.     Police in the area heard shots and immediately apprehended a suspect in possession of the firearm believed to have been used in the shooting. The person arrested at the scene was described as wearing a black sweatshirt and black pants. Witnesses suggested a second person may have fled the location wearing an orange sweatshirt.[8]

76.     The firearm allegedly used in the shooting was recovered during the initial arrest, a fact shared with NYPD personnel via radio transmission and by NYPD members and supervisors at that scene.

77.     This information was promptly transmitted multiple times via radio to NYPD personnel and by NYPD supervisors and investigators present at the scene and was known to

---

[7] Ayana Henry, *Mayor's brother stepping down as head of security detail*, PIX 11, Feb. 24, 2023, *article and interview available at* https://pix11.com/news/local-news/mayor-adams-brother-stepping-down-as-security-adviser/ (last visited May 3, 2024).
[8] In preliminary NYPD communications, sweatshirt was also describe as possibly being pink.

NYPD members, including Defendants. There was no information transmitted establishing the unapprehended individual was armed.

78.     Following the first shooting, dozens of police officers were present in the area, and the location was marked with crime scene tape.

79.     Plaintiffs were not involved in the shooting in any way, nor have they ever been charged with crimes related to that shooting.

80.     At approximately 10:01 PM, approximately thirty (30) minutes after the shooting and immediate apprehension of the suspect, Mr. Woodstock was near 18 Patchen Ave., where he was residing, and where Plaintiffs Smith and Narinesammy were present as overnight guests.

81.     Mr. Woodstock observed Defendant Barker suddenly exit the passenger side of an unmarked van and begin running toward him while brandishing a gun.

82.     Defendant Robles, who was operating the vehicle, abruptly came to a stop and joined in this pursuit.

83.     Upon information and belief, and based upon a review of relevant available NYPD records, on September 29, 2022, Defendant Barker and Defendant Robles were assigned to the UOU security detail for Defendant Mayor Eric Adams, and were providing security at Defendant Adams' townhouse, which is registered at 936 Lafayette Ave. in Kings County, within the confines of the NYPD's 81st Precinct.

84.     Confirmation of this assignment includes, but is not limited to, audio from body worn camera footage in which ESU Lieutenant Kenneth Kong (Tax ID 929439)[9], responding to

---

[9] Lt. Kong is not a named Defendant in this Complaint, as the limited information available at this time does not indicate that he supervised or advised his ESU team to participate in the events surrounding either Plaintiffs' arrest or the September 30, 2022, search of the apartment. This is subject to change upon the identification of Defendant Does and/or disclosures of additional outstanding information.

the scene as a supervisor with the NYPD's Emergency Services Unit (ESU), is briefed by another NYPD supervisor, Defendant Supervisor John Doe # 1, a white male wearing a white shirt.

85.   Defendant Supervisor John Doe # 1 conveyed this information to Lt. Kong after receiving instructions from and/or conferring with Defendants John Chell, Scott Henderson, and Melody Robinson, among other NYPD and/or City officials, including at least two members among Policymaker Defendants Roe # 1 – 5, and at least five members among Defendant NYPD Supervisor Does # 1 – 20, about Mr. Woodstock's shooting.

86.   At the time Defendants Barker and Robles initiated their pursuit, Mr. Woodstock was wearing a black sweater, white tee shirt, and gray pants.

87.   Mr. Woodstock did not match the description of the unapprehended person of interest, who was wearing orange and was neither confirmed to be armed nor to be a suspect in the shooting, facts known to NYPD personnel.

88.   There was no warrant for Mr. Woodstock's arrest.

89.   The pursuit by Defendants Robles and Barker was not lawful.

90.   Mr. Woodstock was aware of the shooting that had taken place several blocks away due to the massive police presence traveling through the neighborhood and due to word of mouth.

91.   When approached by Defendant Barker, who was running toward him while brandishing a gun, after abruptly exiting an unmarked vehicle, Mr. Woodstock feared for his life and fled to enter the apartment building at 18 Patchen Ave.

92.   Mr. Woodstock banged on the lobby door and called for Mr. Smith to open it.

93.   The apartment where Mr. Smith and Ms. Narinesammy were located was on the first floor of the building, down a small hallway from the entryway.

94.     Mr. Smith, initially unaware of Defendants' pursuit, came to open the door to allow Mr. Woodstock to enter.

95.     As Mr. Woodstock was in the threshold of the building lobby, Defendant Barker fired at least two shots at Mr. Woodstock without cause, striking him once in the leg and lodging a second bullet in the doorframe near Mr. Woodstock's head.

96.     At no time did Mr. Woodstock threaten Defendants or behave in a violent manner towards them. Mr. Woodstock posed no risk to Defendants' safety.

97.     Mr. Woodstock cried out in pain and stumbled into the entryway of the apartment building, bleeding profusely from a gunshot wound to his leg.

98.     The glass lobby door closed and locked behind him.

99.     A massive police presence consisting of dozens of NYPD members and officials from multiple precincts and units quickly descended upon 18 Patchen Ave.

100.     Defendants broke down the door to the lobby by shattering the glass, which fell on top of Mr. Woodstock.

101.     Defendants rushed past Mr. Woodstock and into the apartment building, stepping in and tracking his blood through the entryway and hallway and further into the building.

102.     Mr. Smith exited his apartment to assist Mr. Woodstock, attempting to apply pressure to Mr. Woodstock's leg to stem the bleeding.

103.     Defendant Police Officer Randy Paulsaint (Badge # 17773, Tax ID 951022), aiming his gun at Mr. Woodstock, shouted at Mr. Woodstock, who was unarmed and laying on the floor in his own blood and pleading with the Defendants not to shoot, "Don't you fucking move. Put your hands up and shut your mouth. If you move, I will shoot you."

104.     Mr. Woodstock complied with all lawful orders issued by Defendants.

105.    Mr. Smith and Ms. Narinesammy also complied with all lawful orders and pleaded with Defendants Paulsaint, Defendant Supervisor Does # 1 and 2, and Defendant NYPD Officer Does # 1 – 5, at least three of whom had guns drawn and pointed at Plaintiffs, not to shoot him, Mr. Woodstock, or Ms. Narinesammy, who, as he informed Defendants, was pregnant.

106.    Defendant Paulsaint then repeatedly instructed Defendant NYPD Member Jane Doe # 1, who appeared to be a white or light-skinned female with dark hair, to "cuff him up and get him out," referring to Mr. Woodstock.

107.    Defendant Jane Doe # 1 proceeded to grab Mr. Woodstock by the leg and drag him through broken glass while he cried out in pain.

108.    At least two individuals among Defendant NYPD Does # 2 – 3 and/or Defendant NYPD Supervisors # 2 – 3 applied a tourniquet approximately six (6) minutes after Mr. Woodstock was shot, and forcibly pressed into his leg to explore the wound and to apply this tourniquet while Mr. Woodstock remained on top of shards of glass.

109.    Defendants denied and/or delayed Plaintiff's medical care, exacerbating Mr. Woodstock's injuries and causing him additional pain and suffering. Mr. Woodstock did not receive medical attention from medical staff with the New York City Fire Department until approximately fifteen (15) minutes had passed after he was shot.

110.    Defendant Barker was assisted in walking away from the shooting by two NYPD members, who supported him under each arm and led him to a nearby bench.

111.    Defendant Barker complained of tinnitus and was transported to a hospital.

112.    Shortly after the shooting, dozens of NYPD members, including multiple NYPD supervisors and executives, arrived at the scene. Members from the NYPD's 81st Precinct, 83rd Precinct, Emergency Services Unit, Strategic Response Group, and NYPD Force Investigation

Division (FID), which reports its findings to the NYPD First Deputy Commissioner, were present, along with members of the Uniformed Operations Unit, including Defendants Barker and Robles.

113.    These individuals included Defendant NYPD Officer Does # 1 – 20, Defendant NYPD Supervisor Does # 1 – 20, and at least one member among Defendant Policymaker Roes # 1 – 5.

114.    Members of the FID report their findings about every incident in which an NYPD member discharges their firearm to the NYPD First Deputy Commissioner.

115.    At the time of Mr. Woodstock's shooting, the NYPD's First Deputy Commissioner was Defendant Edward Caban, who was aware of the shooting and its circumstances, and was responsible for supervising the NYPD members at the scene and overseeing the investigation into Defendant Barker's use of force by members of the FID.

116.    Defendant NYPD Supervisor Does # 1 – 20 were present at the scene and issued orders and shared information from NYPD and City officials with other NYPD members, and oversaw the implementation of these directives by supervisees, including named NYPD Defendants and Defendant NYPD Officer Does # 1 – 20.

117.    NYPD members were instructed by Defendant Policymaker and Supervisor Does not to discuss the identity or assignment of the shooter while wearing activated body worn cameras.[10]

118.    Present at the scene were multiple high-ranking NYPD and City officials, including Defendants Jeffrey Maddrey, Melody Robinson, and John Chell.

---

[10] Throughout the many hours of body worn camera footage provided on April 30, 2024, by the Kings County District Attorney's Office in response to Plaintiffs' FOIL request, NYPD members are repeatedly seen gesturing or directing other members to deactivate their cameras when the subject of the shooting is raised, despite the surrounding circumstances for which the NYPD Patrol Guide ostensibly directs sustained activation of body worn cameras.

119.    These Defendants, along with Defendant Policymaker Roes # 1 – 5 and Supervisor Does # 1 – 20, orchestrated and/or supervised the arrest of all Plaintiffs and the continued violations of Plaintiffs' civil rights.

120.    Defendants NYPD Does # 4 – 7 placed Mr. Smith under arrest without cause and transported him to the NYPD's 81st Precinct in Kings County.

121.    These Defendants searched Mr. Smith's person and property at the scene multiple times, and again at the NYPD precinct.

122.    These Defendants placed overly tight handcuffs on Mr. Smith and escorted him to a police vehicle while he was barefoot and shirtless. Defendants refused to loosen these overly tight handcuffs when requested by Mr. Smith.

123.    Mr. Smith repeatedly informed Defendants that Ms. Narinesammy was pregnant and experiencing intense anxiety, and repeatedly asked that she be provided medical care.

124.    Defendants NYPD Does # 8 – 10 placed Ms. Narinesammy under arrest without cause and transported her to the 81st Precinct while she remained barefoot.

125.    These Defendants searched Ms. Narinesammy's person and property at the scene multiple times, and again at the NYPD precinct.

126.    These Defendants placed overly tight handcuffs on Ms. Narinesammy and escorted her to a police vehicle. Defendants refused to loosen these overly tight handcuffs when requested by Ms. Narinesammy.

127.    These Defendants transported Plaintiffs Smith and Narinesammy separately to the NYPD's 81st Precinct.

128.    Defendant NYPD Does # 11 – 20 searched Mr. Woodstock's person and property at the scene multiple times, and again at the NYPD precinct.

129.   No weapons were recovered on Mr. Woodstock's person or apartment on September 29, 2022.

130.   At least four members among Defendant NYPD Does # 11 – 20, under the supervision of NYPD Supervisor Does # 1 – 20, transported Mr. Woodstock to Kings County Hospital, where they pressured staff with Defendant New York City Health and Hospitals Corp. to permit his premature discharge for the purpose of transporting him to the NYPD's 81st Precinct.

131.   Despite Mr. Woodstock's condition, the serious nature of his wound, his lack of prescription medications to prevent infection and proper follow-up care instructions, and his status as a patient in NYCHHC care to whom NYCHHC employees and/or agents owed a duty to provide medical care, NYCHHC Does # 1 – 5 agreed to discharge Mr. Woodstock to NYPD Does # 11 – 20. He was discharged from NYCHHC's care wearing only a hospital gown and without the ability to fill a prescription antibiotic he was given.

132.   Defendants transported Mr. Woodstock back to the NYPD's 81st Precinct on the evening of September 29, 2022, or in the early morning hours of September 30, 2022, and would remain in police custody for approximately two days, until the evening of October 1, 2022.

133.   At no time, either prior to or following Defendant Barker's pursuit and utilization of excessive deadly force did any Defendants take steps to mitigate the harms done and/or posed to Plaintiffs, or to intervene in the harmful and/or deficient conduct of their fellow Defendants in any meaningful way.

***Public Statements by Defendants***

134.    On September 30, 2022, Defendant Maddrey, along with Defendants Chell, Marino, and Henderson, conducted a public press conference on the matter.

135.    At this press conference, Defendant Maddrey falsely claimed that Mr. Woodstock was reaching for his waistband and making furtive movements at the time he was shot, when all available evidence, including body worn camera and surveillance footage available at the time, indicates that he was opening a door while running from Defendants, and did not reach for any firearm, nor did he pose a threat to Defendants in any way.

136.    Defendant Maddrey was specifically asked by a member of the press whether the NYPD shooter was a member of the Municipal Security Section. Without naming Defendant Barker, Defendant Maddrey denied Defendant Barker's true assignment, stating, "No, he is assigned to Operations."

137.    The NYPD UOU is one of two units within MSS. However, with Defendant Maddrey having denied the true assignment of Defendant Barker, the provided answer left multiple NYPD units, such as Brooklyn North Operations, as possible assignments.

138.    This obfuscation intentionally concealed Defendant Barker's identity and misrepresented the manner of Mr. Woodstock's shooting in an attempt to minimize scrutiny into the circumstances.

139.    At least one member among Defendant NYPD Supervisor Does # 1 – 20 and/or Policymaker Roes # 1 – 5 further released and/or ordered the release of false information to members of the media falsely alleging Mr. Woodstock's involvement in the earlier shooting, despite contemporaneous knowledge that the shooter had been apprehended, and otherwise falsely placing blame on Mr. Woodstock for becoming a victim of police brutality.

140.     This information was broadcast and/or printed in multiple outlets, including the *New York Daily News*, *The New York Post*, ABC 7, CBS 2, 1010 WINS, and others, where it was widely attributed to "police sources."

141.     At the time of this press conference, Mr. Woodstock remained in police custody, suffering from a gunshot wound, wearing a hospital gown, and unable to contact his family.

### Plaintiffs' Time in Police Custody

142.     Mr. Smith and Ms. Narinesammy remained in NYPD custody for approximately twenty-four (24) hours.

143.     Plaintiffs repeatedly requested to speak with an attorney.

144.     Defendants denied Plaintiffs phone calls until the following day, September 30, 2022, and forced Plaintiffs to endure filthy and unsanitary conditions inside precinct holding cells.

145.     Ms. Narinesammy felt nauseous and began to experience pain in her abdomen and lower back. She repeatedly requested medical care. Defendants denied and/or delayed Plaintiff's medical treatment, only transporting her to a hospital after several hours in NYPD custody for a brief period before forcing her to return to the hospital.

146.     At least two NYPD Defendants, believed to include Defendants Detective Nicholas Gigante (Badge # 1729, Tax ID 949025), and Lieutenant John Dasaro (Tax ID 948198), informed Mr. Smith that he was not free to leave.

147.     Defendants refused to afford Plaintiffs a phone call for their first day in custody.

148.     These Defendants further informed the teenaged Mr. Smith that Ms. Narinesammy would be afforded medical care if, in sum and substance, Mr. Smith told them what they wanted to hear.

149.    Defendants subjected Mr. Smith and Mr. Woodstock each to several extensive interrogations outside the presence of Counsel.

150.    Mr. Smith and Mr. Woodstock were denied food and/or water unless they agreed to speak with Defendants.

151.    These included interrogations conducted between 4:00 AM and 6:00 AM after forcing Plaintiffs to remain awake throughout the night.

152.    Defendants questioned Mr. Smith over his invocation of his right to counsel and forced him to waive the same and/or continue to engage in police questioning under duress for the purpose of the recorded interrogations.

153.    Defendants questioned Mr. Woodstock, who was still suffering from a gunshot wound and wearing only a hospital gown, and over his invocation of his right to counsel, and forced him to waive the same and/or continue to engage in police questioning under duress for the purpose of the recorded interrogations.

154.    Defendants presented false and/or intentionally misleading evidence before Judge Vincent del Giudice of Kings County Supreme Court to secure a warrant for the apartment where Mr. Woodstock was residing.

155.    Defendants searched the apartment at approximately 2:30 PM on September 30, 2022.

156.    During this search, Defendants claimed to locate two handguns.

157.    Based upon the knowingly false and/or misleading information Defendants forwarded to prosecutors and to the Courts, Plaintiff Woodstock with two counts of Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03).

158.    However, despite forcing Plaintiffs to remain in custody for the purposes of collecting additional evidence and/or due to malice, Defendants were unable to establish cause to charge Mr. Smith and Ms. Narinesammy with any crime, and were unable to tie Mr. Woodstock to the shooting on September 29, 2022, which he had not committed.

159.    Despite Defendants forwarding false information to the Kings County Prosecutor's Office, the matters against Mr. Smith and Ms. Narinesammy terminated in their favor when they did not bring charges against Plaintiffs Smith or Narinesammy.

160.    Mr. Woodstock's arrest report, executed by Defendant Detective James McDermott under the supervision of Defendant Captain (then-Lieutenant) John Dasaro (Tax ID 948198), both assigned to FID, as well as Defendant Sergeant Melvin Clarke (Badge # 1380, Tax ID 955822) of the 81st Precinct, omitted the circumstances of Mr. Woodstock's arrest, and identified 14:47 PM on September 30, 2022, as the time of incident giving rise to his arrest.

161.    Neither the arrest report (*see* **Exhibit 2**) nor the charging instrument (*see* **Exhibit 4**), sworn under penalty of perjury by Defendant Detective James McDermott (Badge # 1424), made any mention of the shooting by Defendant Barker, or that Mr. Woodstock was pursued and shot by members of the NYPD at all.

162.    Indeed, the arrest report affirmatively states "NO" when indicating whether there was any use of force by a member of the NYPD.

163.    In the application for the search warrant, sworn and verified before the Court at 12:40 PM on September 30, 2022, Defendant Pedro Romero (Badge # 7348) ("Defendant Romero") made multiple false and/or misrepresented statements to the Court. *See* **Exhibit 1**.

164. In this application, Defendant Romero falsely claimed that Mr. Woodstock "matched the description of the shooter involved in the earlier shooting that had been broadcast over the radio."

165. As all Defendants, including Defendant Romero, were well-aware, the alleged shooter had been arrested at the scene a half an hour prior to Defendant Barker and Robles' unlawful pursuit of Mr. Woodstock, and Mr. Woodstock did not match the description of the possible unapprehended person of interest, who was wearing orange.

166. Defendant Robles provided false information to Defendant McDermott accusing Mr. Woodstock of appearing to reach for his waistband, when had not, and when he was in fact fleeing and attempting to open the door to his home.

167. Defendant McDermott also knew this information to be false but provided the same to Defendant Romero in support of the search warrant application for the home at 18 Patchen Ave, Apt. 1F.

168. Defendant Gigante falsely represented the circumstances of Mr. Woodstock's and Mr. Smith's respective interrogations in support of the search warrant application, including by claiming the statements were freely given by Mr. Smith upon valid waiver of his *Miranda* rights, and failing to mention that each person had been kept awake overnight while under arrest, were subjected to multiple non-recorded interrogations, and were coerced into providing information to support Defendants' account of events.

169. These interrogations were overseen by Defendant Dasaro, then the Lieutenant supervising FID members and the division's investigations into use of force against civilians.

170.    The application also failed to mention that Mr. Smith had repeatedly invoked his right to an attorney, and that his family had contacted an attorney, who, upon information and belief, contacted the NYPD's 81st Precinct to invoke his rights.

171.    The application further failed to mention that Mr. Smith was 18 years old.[11]

172.    Defendants forwarded false information to the Courts and to the prosecuting agency, the Kings County District Attorney's Office.

173.    Attorneys for Defendant City, in opposition to Plaintiff's Petition for a Late Notice of Claim, though it was ultimately granted in Petitioner's favor, also specifically attached the Arrest Report and Complaint Report as exhibits to deny knowledge of City and/or NYPD Executives' knowledge of the essential facts of the case.

174.    These misrepresentations by Defendants effectively concealed and/or falsely presented critical facts underlying Mr. Woodstock's criminal charges, interfered with his right to a fair trial, and materially affected Mr. Woodstock's attempts to vindicate his rights.

175.    Mr. Smith and Ms. Narinesammy were released from police custody at approximately 12:00 AM on October 1, 2022.

176.    Mr. Woodstock remained in NYPD custody until his arraignment on or about the evening of October 1, 2022, based on the false information provided by Defendants for charges stemming from September 30, 2022, not the date of his shooting. *See* **Exhibits 1 – 4**.

177.    Defendants' misrepresentations further served to falsely suggest that Mr. Woodstock was in custody for approximately 24-36 hours, from September 30, 2022, until on or

---

[11] While search warrant applications do not need to include a recitation of all events and circumstances, Defendants intentionally excluded and/or misrepresented relevant information to intentionally present an inaccurate application to the Court.

about October 1, 2022, and not for at least an additional 24 hours prior to his transportation to Central Booking at 120 Schermerhorn St. in Kings County.

178.     Plaintiff Woodstock was assigned counsel.[12]

179.     Bail was set based on the information forwarded to the Court and the Kings County District Attorney's Office by Defendants, and Mr. Woodstock was transferred to Defendant City's Department of Correction custody until on or about October 9, 2022.

180.     Defendants further presented false testimony to the grand jury to secure a felony indictment against Mr. Woodstock.

181.     Mr. Woodstock spent approximately eight (8) days incarcerated and experiencing filthy and dangerous conditions without adequate food, water, recreation, or adequate medical care at Rikers Island in Bronx County until his family was able to post bond.

182.     On or about November 9, 2023, based on information provided by Defendants to the Court and prosecution and Defendants' interference with his constitutional right to a fair trial, Plaintiff Woodstock entered a plea of guilty to two counts of P.L. § 110/265.03, Attempted Criminal Possession of a Weapon in the Second Degree, a D-felony, for the charges levied against him dated September 30, 2022.

---

[12] Assigned defense counsel, Matthew Mobilia, is a member of the Kings County appointed counsel panel under N.Y. Co. Law Art. 18-B. To date, Mr. Mobilia has refused to disclose any records to Plaintiffs' Counsel. Plaintiffs' Counsel made no fewer than ten (10) written requests for the same through various means and placed numerous unanswered phone calls, and Mr. Woodstock expressly directed disclosure himself on multiple occasions. Aside from answering one outreach by Plaintiffs' Counsel made to a personal cell phone in November 2023, in which he assured Plaintiffs' Counsel he would promptly share the defense file, which he did not, Mr. Mobilia has not responded to any means of communication since outreach began in July 2023. The limited disclosures in Plaintiffs' possession come from the Kings County District Attorney's Office pursuant to a FOIL request, and from the Legal Aid Society, which served as appointed counsel at Mr. Woodstock's arraignment prior to the Court granting Mr. Mobilia's request to appear as defense counsel in the matter.

183.    The NYPD FOIL Bureau denied Plaintiff's requests for records related to his own shooting and related investigation pursuant to FOIL, citing the "ongoing" internal investigation as cause to refuse to release records to the shooting victim himself as recently as November 2023.

### *Damages: Plaintiff Shahid Woodstock*

184.    Defendants have caused Mr. Woodstock to suffer significant damage and loss of sensation and mobility to his right leg.

185.    Mr. Woodstock suffered lost wages, was forced to expend costs including transportation and medical costs and will suffer future lost income due to Defendants' conduct, their deprivation of his liberty, and his physical injuries.

186.    As a result of Defendants' conduct, Mr. Woodstock further suffered bruising, lacerations, and scarring to his leg, where he was shot, and to both legs caused by lacerations from broken glass.

187.    As a result of Defendants' conduct, Mr. Woodstock has suffered nerve damage, reduced range of motion, and other damages to the leg where he was shot.

188.    He suffered pain, swelling, and loss of sensation to his wrists from Defendants' application of overly tight handcuffs.

189.    Defendants further caused Mr. Woodstock emotional and psychological damages, including anxiety, fear of death, difficulty sleeping, humiliation, emotional anguish, depression, and post-traumatic stress.

190.    The full extent of Mr. Woodstock's physical and psychological injuries is not yet known, and their effects are ongoing.

*Damages: Plaintiff Jahiem Smith*

191.    Defendants placed Jahiem Smith in fear for his life, Mr. Woodstock's life, and the life of his pregnant partner, Tiffanie Narinesammy.

192.    Jahiem Smith was present in the zone of danger for Mr. Woodstock's shooting, and Defendants pointed multiple loaded guns at him personally.

193.    Mr. Woodstock suffered lost wages, was forced to expend costs including transportation and medical costs and will suffer future lost income due to Defendants' conduct, their deprivation of his liberty, and his physical injuries.

194.    As a result of Defendants' conduct, Mr. Woodstock further suffered bruising, lacerations, and scarring to his face, right leg, hands, and both knees. He suffered pain, swelling, and loss of sensation to his wrists from Defendants' application of overly tight handcuffs.

195.    Defendants further caused Mr. Woodstock emotional and psychological damages, including anxiety, fear of death, difficulty sleeping, humiliation, emotional anguish, depression, and post-traumatic stress.

196.    The full extent of Mr. Woodstock's physical and psychological injuries is not yet known, and their effects are ongoing.

*Damages: Tiffanie Narinesammy*

197.    Defendants caused Ms. Narinesammy, who was 18 years old and pregnant at the time of this incident, to suffer serious physical and emotional damages.

198.    Defendants placed Ms. Narinesammy in fear for her own life and the life of Plaintiffs, and she was in the zone of danger for Plaintiff Woodstock's shooting.

199.   Defendants further caused Ms. Narinesammy emotional and psychological damages, including fear of death, anxiety, difficulty sleeping, humiliation, emotional anguish, depression, and post-traumatic stress.

200.   On the date of the incident, during her time in Defendants' custody, Ms. Narinesammy began experiencing severe lower back pain and abdominal cramping.

201.   In the weeks following this incident, Ms. Narinesammy suffered from difficulty eating and sleeping, pain and cramping to her abdomen and lower back, pregnancy complications, and additional effects of acute trauma and post-traumatic stress.

202.   Approximately six (6) weeks after the shock of the shooting and her ensuing detention by Defendants, and following the resulting complications to her pregnancy, Ms. Narinesammy suffered a traumatic stillbirth and was treated at a hospital believed to be Montefiore Hospital in Bronx County.

203.   Ms. Narinesammy further suffered lost wages, was forced to expend costs including transportation and medical costs and will suffer future lost income due to Defendants' conduct, their deprivation of her liberty, and her physical injuries.

204.   As a result of Defendants' conduct, Ms. Narinesammy further suffered pain, swelling, and loss of sensation to his wrists from Defendants' application of overly tight handcuffs.

205.   The full extent of Ms. Narinesammy's physical and psychological injuries is not yet known, and their effects are ongoing.

206.   Plaintiffs therefore bring the following claims for relief against Defendants.

207.   All claims are brought on behalf of all Plaintiffs as against all Defendants other than Defendants NYCHHC and NYCHHC Does, unless specifically stated.

## FIRST CLAIM FOR RELIEF

### Excessive Force

***On Behalf of All Plaintiffs Against Defendants Barker, Robles, Paulsaint, NYPD Officer Does # 1 – 20 and NYPD Supervisor Does # 1 – 20 Pursuant to 42 U.S.C. § 1983 for Violations of Plaintiffs' rights Under the Fourth and Fourteenth Amendments to the United States Constitution***

208.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

209.    Defendants' multiple uses of excessive force against Plaintiffs were unjustified, objectively unreasonable, and clearly intended as punishment when taking into consideration the facts and circumstances that confronted Defendants.

210.    These uses of force include, but are not limited to:

a. Defendant Barker and Robles unlawfully pursued Plaintiff Woodstock.

b. Defendant Barker shot Plaintiff Woodstock with his service weapon while he attempted to flee, Defendant Barker intentionally utilized deadly force against Plaintiff Woodstock in a manner that was unreasonable under the circumstances, thereby causing significant injury to Plaintiff Woodstock.

c. Defendants Paulsaint and at least five members among NYPD Defendant Officer or Supervisor Does # 1 – 20 further utilized excessive force in threatening to shoot Plaintiffs while aiming weapons at them while they complied with lawful orders, in excessively and forcefully yanking and/or dragging Mr. Woodstock.

d. Defendant Jane Doe # 1 dragged Plaintiff Woodstock through broken glass, and at least two individuals among Defendant NYPD Officer and/or Supervisor Does # 1 – 20 yanked Mr. Woodstock to a standing position, and otherwise physically assaulted Plaintiff Woodstock, who was the victim of a shooting, had suffered

significant blood loss, was unable to stand unassisted, and posed no threat to Defendants.

e. Defendant NYPD Does # 4 – 7 intentionally utilized excessive force against Plaintiff Smith in a manner that was unreasonable under the circumstances, thereby causing significant injury to Plaintiff Smith, including through Defendants' application and refusal to adjust overly tight handcuffs to Mr. Smith's wrists and forcing him to remained shackled for many hours in this position while in police custody.

f. Defendant NYPD Does # 8 – 10 intentionally utilized excessive force against Plaintiff Narinesammy in a manner that was unreasonable under the circumstances, thereby causing significant injury to Plaintiff Narinesammy, including through Defendants' application and refusal to adjust overly tight handcuffs to Ms. Narinesammy's wrists. Defendants forced her to remain shackled for many hours in this position while in police custody.

211.  As a result of Defendant's acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

212.  At no time did any Defendants intervene in the impermissible and/or abusive and/or otherwise deficient conduct of any other Defendants.

## SECOND CLAIM FOR RELIEF

**The Right of Security Against Unreasonable Search and Seizure and Against Excessive Force, Regardless of Whether Such Force Is Used in Connection with a Search or Seizure**

***On Behalf of All Plaintiffs Against Defendant City and Defendants Barker, Robles, Romero, Robinson, Marino, McDermott, Gigante, Dasaro, Clarke, NYPD Does # 1 – 20, NYPD***

***Supervisor Does # 1 – 20 Pursuant to*** <u>**New York City Administrative Code Title 8, Chapter 8**</u>
<u>**(§ 8-801, et seq.)**</u>

213.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

214.     As described above, the Defendants violated Plaintiffs' right to be free from "unreasonable searches and seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a search or seizure."

215.     Pursuant to <u>NYC Admin. Code Title 8, Chapter 8, §§ 8-801 through 8-809</u> of the New York City Civil Rights Law, Plaintiffs maintain a private right of action against the individual NYPD Defendants and their employer, Defendant City, for this conduct.

216.     The Defendants employed by Defendant City's NYPD are "covered individuals" as defined in <u>§ 8-801</u> of this Chapter.

217.     Pursuant to <u>§ 8-802</u>, *et seq.*, these Defendants and their employer, including Defendant City, are liable to Plaintiffs for the conduct described herein.

218.     Pursuant to <u>§ 8-803</u>, Plaintiffs' claims under common law or pursuant to any other law or rule are not limited or abrogated by their invocation of this provision.

219.     The remedies provided by this chapter are in addition to any other remedies that may be provided for under common law or pursuant to any other law or rule.

220.     Pursuant to <u>§ 8-804</u>, Defendants may not invoke the defense of qualified immunity to avoid liability for this cause of action.

221.     Pursuant to <u>§ 8-806</u>, Plaintiffs are entitled to compensatory and punitive damages, attorney's fees and costs, and an order restraining the Defendants from engaging in further violative conduct.

222.     Plaintiffs are each entitled to damages, injunctive relief, and policy change against Defendants.

**THIRD CLAIM FOR RELIEF**

**Violations of Plaintiffs' Due Process Rights**

*Pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution*

223.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

224.     Defendants City, by Defendants Adams, Sewell, Caban, Maddrey, Chell, Marino, and other policymakers for Defendant City, designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in subjecting Plaintiff to the violations of his Due Process rights described elsewhere herein.

225.     Defendants collectively and individually denied and/or frustrated Plaintiffs' Due Process rights and deprived Plaintiffs of liberty without due process of law by imposing punishment upon Plaintiffs and by engaging in the violations complained of herein.

226.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

227.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTH CLAIM FOR RELIEF

### Municipal Liability

***Against Defendant City Pursuant to 42 U.S.C. § 1983 and <u>Monell v. Department of Social Services</u> (436 U.S. 658 [1978]) for Defendants' Violations of Plaintiffs' Rights Under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution***

228.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

229.    Defendant City, through its policymakers including Defendant Adams, Defendant NYPD Commissioners Sewell and Caban, Defendant Marmara, Defendant Banks, and Defendant Maddrey, were responsible for implementing and enforcing policies and procedures on behalf of the Defendant City.

230.    The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiffs to, including, but not limited to:

    a.    Subjecting civilians to excessive uses of force;

    b.    The misappropriation, mismanagement, and lack of oversight for NYPD security details afforded to City executives and other individuals;

    c.    Lack of disclosures related to NYPD MSS/Inteligence Bureau Management in an effort to reduce transparency;

    d.    The concealment and/or obfuscation of criminal and/or constitutionally deficient activity engaged in and/or implicating NYPD members, including former NYPD members, such as Defendant Mayor Adams;

    e.    Engaging in impermissible searches and seizures during street encounters, including in violation of the Court's directives in *Floyd, et al. v. City of New York*, 08-CV-1034 (AT), *Ligon, et al. v. City of New York, et al.*, 12-CV-2274

(AT), and *Davis, et al. v. City of New York, et al.*, 10-CV-0699 (AT) (Plaintiffs

incorporate these matters by reference); and

f.   The promotion of NYPD members to positions of supervisory and/or

policymaking authority despite these members' respective histories of abuse,

assault, misleading statements, or otherwise deficient conduct.

231.   This conduct has been the subject of numerous lawsuits and constituted, at least in

part, the basis for various investigations and reports, including by the appointed Federal Monitor

for the NYPD in *Floyd*, *Ligon*, and *Davis*.

232.   Following the so-called FID investigation into Mr. Woodstock's shooting, several

Defendants received promotions and/or benefits from Defendant City and Defendant Adams,

including, but not limited to the promotion of Defendant Edward Caban to Police Commissioner

and the promotion of Defendant John Dasaro to Captain.

233.   All of the wrongful acts or omissions complained of herein were carried out by the

individual named and unnamed police officer defendants pursuant to:

a.   Formal policies, rules, and procedures of Defendant City;

b.   Actions and decisions by Defendant City's policymaking agents including, but

not limited to, Defendants Mayor Adams, Sewell, Caban, Maddrey, and Chell;

c.   Customs, practices, and usage of the NYPD that are so widespread and

pervasive as to constitute *de facto* policies accepted, encouraged, condoned,

ratified, sanctioned, and/or enforced by Defendant City and by Defendants

Mayor Adams, Sewell, Caban, Maddrey, and other policymaking officials;

d.   Defendant City's deliberate indifference to Plaintiffs' rights secured by the

First, Fourth, and Fourteenth Amendments of the United States Constitution,

as evidenced by the County's failures, and the failures of the County's policymaking agents, to train, supervise, and discipline NYPD Members, despite full knowledge of the members' wrongful acts, as described herein.

## FIFTH CLAIM FOR RELIEF

### Failure to Train and/or Supervise

***Against Defendants City, Policymaker Defendants, and NYPD Supervisor Defendants Pursuant to 42 U.S.C. § 1983 and <u>Monell v.</u> <u>Department of Social Services</u>, 436 U.S. 658 (1978)***

234.   Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

235.   Defendant City and its policymaker Defendants Mayor Adams, Sewell, Marmara, Maddrey, Robinson, Marino, Chell, and NYPD supervisors failed to train and supervise the Defendant NYPD members.

236.   All individual Defendants were employees and/or agents of Defendant City and were acting within the scope of their employment at the time of the conduct giving rise to Plaintiffs' injuries.

237.   Defendants knew or should have known that Defendant NYPD Members were likely to violate the constitutional rights of individuals in their custody.

238.   Defendants know that NYPD Members are certain to regularly encounter circumstances described herein, including encounters with civilians in public places, through the course of their employment.

239.   Defendants knew that there is a history of wrongful conduct in these scenarios by NYPD Members.

240.    Defendants further knew that training and/or supervision could ameliorate the potential harms of constitutional violations in these scenarios, including civil rights violations and physical and emotional injuries.

241.    Nevertheless, Defendants failed to train its agents and/or employees regarding their conduct during the scenarios described herein and further failed to supervise its agents and/or employees when engaged in high-risk contact.

242.    By failing to train and supervise Defendant NYPD Members, these Defendants exhibited a conscious disregard and/or deliberate indifference for the risks posed by NYPD members' conduct absent adequate training and supervision.

## SIXTH CLAIM FOR RELIEF

### Negligent Screening, Hiring, and Retention

*Against Defendants City, Adams, Policymaker Defendants, and NYPD Supervisor Defendants Pursuant to 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978)*

243.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

244.    All Defendants were employees and/or agents of Defendant City and were acting within the scope of their employment at the time of the conduct giving rise to Plaintiff's injuries.

245.    Defendant City and its policymaker officers, including, but not limited to, Defendants Adams, Banks, Sewell, Marmara, Maddrey, Robinson, Marino, and Chell, knew that the individual Defendants had a propensity for the conduct giving rise to Plaintiff's injuries.

246.    This knowledge and Defendants' policies are exemplified through their conduct in matters concerning Defendants implicated herein, including, not limited to:

a.  The employment of Defendant David Barker, who also has a history of thirty-one (31) CCRB allegations, with seven (7) substantiated claims;

b.  The employment and promotion of Defendant John Dasaro, who has a history of thirty-one (31) CCRB allegations, with eight (8) substantiated claims, in addition to a history of civil rights lawsuits, and who was transferred to the FID to investigate uses of force against civilians following an incident in which the CCRB determined he had pointed a gun at three children whose friend been struck with an NYPD police cruiser while trick-or-treating on Halloween, and had falsely reported the circumstances; [13]

c.  The Civilian Complaint Review Board's determination that Defendant Maddrey abused his authority in the matter of KB, KM, and BS, in which three children in Brooklyn were chased for seven minutes by a retired NYPD officer while he brandished a gun, and where Defendant Maddrey attempted to have the children charged with criminal conduct after voiding the former officer's valid arrest; [14] and

d.  The employment and promotion of Defendant John Chell following a civil jury's finding in *Bovell v City of New York, et al*., establishing that Defendant Chell lied under oath regarding the circumstances under which he killed

---

[13] *See* Eric Umansky, *A Police Car Hit a Kid on Halloween 2019. The NYPD Is Quashing a Move to Punish the Officer*, PROPUBLICA, Feb 2, 2022, *available at* https://www.propublica.org/article/a-police-car-hit-a-kid-on-halloween-2019-the-nypd-is-quashing-a-move-to-punish-the-officer (last visited May 6, 2024).
[14] *See* Yoav Gonan, *Top Uniformed NYPD Cop's Misconduct Case Headed for Internal Trial*, THE CITY, May 24, 2023, https://www.thecity.nyc/2023/05/24/jeffrey-maddrey-nypd-police-oversight/ (last visited May 6, 2024).

Ortanzso Bovell, as Mr. Bovell was fleeing from Defendant Chell and posed no threat when Defendant Chell shot him in the back.[15]

247.   Defendants failed to adequately screen, hire, or retain employees in consideration of such employees' recognizable propensity for harm.

248.   Plaintiffs were each injured as a result of Defendants' conduct.

## SEVENTH CLAIM FOR RELIEF

### Equal Protection Violations

***Pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution***

249.   Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

250.   Plaintiffs, compared with others similarly situated, were selectively treated by Defendants, and such selective treatment was based on impermissible considerations such as race and/or an intention to inhibit or punish the exercise of constitutional rights and/or with a malicious or bad faith intent to injure a person.

251.   Plaintiffs were treated differently than an identifiable, similarly situated group of individuals for malicious reasons and/or were intentionally treated differently from others similarly situated without rational basis for this difference in treatment.

252.   Plaintiffs were further treated as a "class of one" and denied equal protection when compared to individual(s) in circumstances otherwise strikingly similar to their own.

253.   Defendant Barker, an NYPD employee and member of MSS/UOU, shot Mr. Woodstock on September 29, 2022.

---

[15] *See* Eileen Grench, *NYPD 'Accidental' Killer Cop's Rise to Brooklyn Chief Questioned*, THE CITY, April 15, 2021, *available at* https://www.thecity.nyc/2021/04/15/nypd-accidental-killers-rise-to-brooklyn-chief-questioned/ (last visited April 2, 2024).

254.    When Mr. Woodstock was shot, Defendants with both the City and the NYPD mobilized to protect Defendant Barker, not the shooting victim. Indeed, this disparate treatment came at a steep cost for Mr. Woodstock and his loved ones, including and especially Plaintiffs Smith and Narinesammy.

255.    Mr. Woodstock, as a victim of a shooting by police, was provided apparently disparate treatment to other victims of shootings, whose cases are investigated by NYPD members as crimes against the injured person and who are considered victims of violence.

256.    Plaintiffs Smith and Narinesammy were likewise treated in a disparate manner, as witnesses who offered potentially exonerating information regarding Plaintiff Woodstock, as compared to other individuals who witness—but are not suspected of committing—violent acts that may constitute a crime.

257.    Indeed, on the night of the shooting, two specific instances cast the disparate treatment of Plaintiffs into sharp relief.

258.    The first is the non-fatal shooting of the two individuals prior to Defendant Woodstock, whose assailant was promptly arrested, and who were not placed under arrest without cause. Following this incident, investigating NYPD members interviewed nearby witnesses in a non-threatening manner without placing these individuals and/or bystanders under arrest.

259.    The second is the disparate treatment as compared to Defendant Barker, who shot a fleeing person without cause and allegedly suffered from tinnitus. Defendant Barker received prompt medical attention. He was assisted to a sitting position on a nearby bench by multiple NYPD members while Mr. Woodstock was dragged through shattered glass. Defendant Barker was afforded representation, in the form of a PBA representative, prior to any interview took place. He was not arrested; he was not charged with a crime.

260.   At no time were Plaintiffs, as the victims and witnesses of police-imposed violence, treated in a manner consistent with the treatment of other victims of violent crimes that are not carried out by police.

261.   Plaintiffs were injured as a result of Defendants' conduct.

## EIGHTH CLAIM FOR RELIEF

### Breach of Duty to Protect

### *Pursuant to 42 U.S.C. § 1983*

262.   Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

263.   The Defendant City, by its agents, had a special duty to Plaintiff and possessed sufficient knowledge that inaction would lead to the harms suffered by Plaintiff.

264.   Defendants witnessed and/or knew of the harmful conduct of fellow Defendants and merely observed and/or unreasonably ignored such conduct against Plaintiff.

265.   Defendant City and its employees and/or agents breached the existing duty to protect Plaintiff, and such inaction enabled and/or facilitated and/or exacerbated the harms caused by Defendants' conduct and suffered by Plaintiffs.

## NINTH CLAIM FOR RELIEF

### Conspiracy

### *Pursuant to 42 U.S.C. § 1985(3)*

266.   Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

267.   Through the conduct described and complained of herein, Defendants conspired to deprive Plaintiffs of the equal protection of the laws, or of equal privileges and immunities under the laws.

268.    Defendants acted in furtherance of this conspiracy against Plaintiffs, and as a result of this conduct, Plaintiffs were injured in his person and property and deprived of their constitutional and civil rights.

### TENTH CLAIM FOR RELIEF

### Failure to Prevent Civil Rights Violations

### *Pursuant to 42 U.S.C. § 1986*

269.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

270.    The NYPD Defendants had knowledge that the wrongs conspired to be done against Plaintiff in violation of 42 U.S.C. § 1985 were to be committed and had the power to prevent and/or aid in preventing the commission of this conduct.

271.    Defendants neglected and/or refused to prevent the commission of this conduct and Plaintiffs sustained harm and/or the exacerbation of harm and the deprivation of their rights as a result of this failure.

272.    Defendants are liable for all damages caused by the conspiratorial conduct they failed to prevent despite possessing the power to do so.

### ELEVENTH CLAIM FOR RELIEF

### Deliberate Indifference to Safety

### *Pursuant to 42 USC § 1983 and the Fourteenth Amendment to the United States Constitution*

273.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

274.    Defendants were aware of the risks posed to Plaintiffs while they was in the presence of Defendants and was otherwise subjected to Defendants' conduct described herein.

275.     Defendants failed to protect Plaintiffs or to otherwise reasonably provide for Plaintiffs' safety, including through the conduct described above.

276.     Defendants failed to take reasonable measures to abate the harms posed to Plaintiffs, and Plaintiffs were injured as a result.

277.     Through Defendants' conduct, including actions, inactions, and policies, Defendants demonstrated a deliberate disregard for Plaintiffs' safety.

278.     As a result of Defendants' deliberate indifference to Plaintiffs' safety, Plaintiffs experienced the injuries complained of herein.

## TWELFTH CLAIM FOR RELIEF

### Failure to Intervene

***Pursuant to 42 USC § 1983 and the Fourteenth Amendment to the United States Constitution***

279.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

280.     Defendants were aware of the unconstitutional and/or deficient conduct of Defendants and were present to observe and/or aware of the same.

281.     Defendants failed to intervene in this conduct by NYPD and/or City employees and/or agents and/or policymakers despite possessing the knowledge and opportunity to do so.

282.     Defendants failed to take reasonable measures to abate the foreseeable harms posed to Plaintiffs by this conduct, and Plaintiffs were injured as a result.

283.     As a result of Defendants' conduct, including the above-described inaction and failure to intervene in the deficient conduct of other Defendants, Plaintiffs were seriously injured.

## THIRTEENTH CLAIM FOR RELIEF

### Malicious Prosecution

*Pursuant to 42 U.S.C. 1983 and Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

284.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

285.    Defendants instituted or caused the claim against Plaintiffs to be instituted without any probable cause. Defendants provided false information to further the criminal prosecution of Plaintiff.

286.    Defendants' motive in instituting the suit was malicious, and the prosecution of Plaintiffs were terminated in their favor when the Kings County District Attorney declined to prosecute any charges stemming from September 29, 2022, against any Plaintiffs.

287.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their liberty and their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

288.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FOURTEENTH CLAIM FOR RELIEF

### Violations of Fair Trial Rights

*Pursuant to 42 USC § 1983 and the Sixth and Fourteenth Amendments of the United States Constitution*

289.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

290.    NYPD Defendants were investigating officials involved in arresting and investigating the circumstances of the events described herein.

291.    While performing their duty as members of the NYPD, Defendants fabricated evidence likely to influence a jury's decision, were that information to be presented to a jury, and forwarded that information to prosecutors.

292.    Defendants disseminated false information to prosecutors, the Court, the media, and the public to intentionally misrepresent the circumstances of Defendant Barker's shooting of Plainitff Woordstock and the NYPD and/or City's response to this incident in an attempt to exonerate themselves of wrongdoing, discredit Plaintiffs, and taint prosecutors and/or any potential jury pool.

293.    As a result of Defendants' conduct, Plaintiffs suffered a deprivation of their liberty.

### FIFTEENTH CLAIM FOR RELIEF

**Claims Under New York State Law**

294.     Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

295.    As a result of the conduct described herein, Plaintiffs were deprived of their liberty, suffered specific and serious bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

296.    The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority.

297.    As a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

### I.    Violations of the New York State Constitution

298.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I §§ 5, 11, and 12 of the New York State Constitution.

299.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 5, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

### II.    False Arrest

300.    By the actions described above, the police officials described above did falsely detain Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so.

301.    Plaintiffs were conscious of the confinement and it was without their consent.

302.    Defendants levied false allegations against Plaintiffs to wrongfully seize, detain, and arrest them.

303.    Defendants did not have the lawful authority to arrest Plaintiffs and/or search Plaintiffs and their personal belongings.

304.    Plaintiffs Smith and Narinesammy were never charged with a crime.

305.    Plaintiff Woodstock was only charged with a crime on September 30, 2022, despite his continual confinement following his arrest by Defendants on September 29, 2022.

### III.    Fabrication of Evidence

306.    Defendants were investigating officials in this matter.

307. Defendants knowingly fabricated evidence likely to influence a finder of fact and forwarded this information to prosecutors.

308. As a result of this fabrication, Plaintiffs suffered deprivations of their life, liberty, and/or property and suffered significant injuries.

### IV.   Excessive/Unreasonable Detention

309. By the actions described above, the Defendants described above did excessively detain Plaintiffs within the meaning of New York common law.

310. In addition to the false and warrantless nature of Plaintiffs' initial detention by Defendants, Defendants further held Plaintiffs in custody for an excessive period of time for the purpose of gathering additional evidence to justify Plaintiffs' arrest and/or due to by ill will on the part of Defendants against Plaintiffs and/or to cause delay for delay's sake.

311. Plaintiff Woodstock was in NYPD custody for approximately 48 hours prior to his arraignment on the very criminal charges he was held in custody for Defendants to construct.

312. Plaintiffs Smith and Narinesammy were held in custody for at least 24 hours despite not being charged with any crime as Defendants attempted to build a case against Mr. Woodstock and/or Plaintiffs.

313. Plaintiffs were conscious of their confinement by Defendants, and this confinement was undertaken without their consent.

### V.   Denial and/or Delay of Medical Care

***On Behalf of Plaintiffs Woodstock and Narinesammy Pursuant to <u>New York State Civil Rights Law Article 3 § 28</u> (<u>N.Y. Civ. § 28</u>) as well as New York State Common and Constitutional Law***

314.     At the time of the incident giving rise to the instant Complaint, Plaintiffs were in the custody of Defendants, who are each a "police officer, peace officer or other law enforcement representative or entity" within the meaning of the New York State Civil Rights Law.

315.     As such, Defendants had a duty to provide assistance and treatment for Plaintiffs' medical needs.

316.     Defendants abdicated their duties under this statute and failed to provide and/or delayed in providing medical care to Plaintiff Woodstock, who had suffered a recent gunshot wound. This denial and/or delay included forcing Mr. Woodstock to be discharged while requiring additional treatment, and the failure to provide Mr. Woodstock with the antibiotics prescribed by Kings County Hospital, resulting in inflammation and infection to his wound, exacerbating his injuries, suffering, and scarring.

317.      Defendants further abdicated their duties under this statute in denying and/or delaying medical care for Plaintiff Narinesammy, who Defendants were aware was a pregnant teenager who suffered from significant anxiety.

318.     Though Defendants ultimately transported Ms. Narinesammy to a hospital, this transportation was delayed by many hours, during which time Ms. Narinesammy was barefoot, suffering from panic attacks, unable to use a bathroom, and experiencing severe pain while in police custody.

319.     This denial and/or delay caused Ms. Narinesammy serious harm, exacerbated her injuries and/or medical condition, and caused her significant pain and suffering.

320.     Such denial and/or delay was unreasonable and caused delay in Plaintiffs' treatment for a serious physical and/or emotional injury and/or medical condition, which were documented and known to Defendants.

321.    This failure resulted in serious injury and/or the exacerbation of Plaintiffs' injuries for which Defendants are liable.

## VI.    Assault and Battery

322.    Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

323.    The force utilized by Defendants was unreasonable and intentional, and this force caused significant injury to Plaintiffs.

324.    Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

325.    Defendants did thereby inflict assault and battery upon the Plaintiffs.

## VII.    Excessive Force

326.    Defendants use of force against Plaintiffs was unjustified, objectively unreasonable, and/or intended as punishment when taking into consideration the facts and circumstances that confronted Defendants.

327.    This conduct caused Plaintiffs physical injury and emotional anguish, and Defendants are liable to Plaintiffs for this conduct and the resulting injuries suffered by Plaintiffs.

## VIII.    Negligence

328.    Defendants owed a special duty to Plaintiffs and breached this duty through their conduct described herein. Defendants' negligence in fulfilling their duty to Plaintiffs resulted in Plaintiffs' injuries and they are liable for this conduct and its resulting injuries.

## IV.    Negligence

*Against Defendants NYCHHC and NYCHHC Does on Behalf of Plaintiff Woodstock*

329.   Defendants owed a special duty to Plaintiffs and breached this duty through their conduct described herein.

330.   Plaintiff Woodstock was a patient at Kings County Hospital, an NYCHHC facility, which was operated by NYCHHC staff and/or employees, and where he was receiving medical care for a gunshot wound.

331.   This conduct includes permitting and facilitating the premature discharge of Plaintiff Woodstock, a victim of police violence, causing him additional pain and suffering and exacerbating his injuries.

332.   Defendants' negligence in fulfilling their duty to Plaintiffs resulted in Plaintiffs' injuries and they are liable for this conduct and its resulting injuries.

## V.      Intentional Infliction of Emotional Distress

333.   By the actions described above, Defendants engaged in extreme and outrageous conduct.

334.   Defendants intentionally caused Plaintiffs to suffer severe emotional distress and/or acted with a disregard for the substantial probability of causing the same.

335.   Plaintiffs suffered severe emotional distress as the direct result of Defendants' conduct, which was outside the bounds of decency.

## VI.     Negligent Infliction of Emotional Distress

*Including as Against Defendants NYCHHC and NYCHHC Does on Behalf of Defendant Woodstock*

336.   Defendants owed Plaintiffs a duty of care and breached this duty of care through the conduct described herein, directly causing them emotional harms, including post-traumatic stress, fear of death, insomnia, depression, and ongoing anxiety.

## VII.    Negligent Training, Retention, Hiring and Supervision

*Including as Against Defendant NYCHHC on Behalf of Plaintiff Woodstock*

337.    Upon information and belief, Defendants City and NYCHHC supervised and trained the individual employees and/or agents and/or officials described above and did so in a negligent manner resulting in the harms described.

338.    At all times relevant herein, Defendants were employed by, and acting in the scope of their employment with, Defendants City and/or NYCHHC.

339.    Defendant employers knew or should have known these agents and/or employees had a propensity for the conduct causing Plaintiffs' injuries, and/or that such conduct by NYPD and/or NYCHHC employees was both foreseeable and likely to result in harm.

340.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demands a jury trial of all issues capable of being determined by a jury.

## CONCLUSION AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully seek relief from this Court and demands judgment against the individual Defendants and the City of New York in the following forms:

 i.    Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

 ii.    Actual damages in an amount to be determined at trial against Defendant City;

 ii.    Policy change, including the enforcement of Freedom of Information Law responses to requests submitted by or on behalf of individuals injured by the NYPD regardless of the status of IAB/FID investigations, and the

immediate mandatory investigation of all MOS shootings by an independent NYPD oversight agency;

iii.     Statutory attorney's fees, disbursements, punitive damages, actual damages, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988, N.Y. Civ. § 28, NYC Admin. Code § 8-802, and New York common law; and

iv.     Such other relief as the Court deems just and proper.

Dated:     Brooklyn, New York
           May 8, 2024

**KAISHIAN & MORTAZAVI LLC**
**Attorneys for Plaintiffs Woodstock,**
**Smith, and Narinesammy**

By: _____

Maryanne K. Kaishian
55 Washington Street, Ste. 508
Brooklyn, New York 11201
T: (347) 662-2421
E: mk@kaishianlaw.com

## ATTORNEY VERIFICATION

I, MARYANNE K. KAISHIAN, an attorney duly admitted to practice before the United States Court for the Eastern District of New York, affirm the following to be true under the penalties of perjury:

1.      I am the attorney of record for the Plaintiffs Shahid Woodstock, Jahiem Smith, and Tiffanie Narinesammy.

2.      I have read the annexed Verified Complaint and know the contents thereof, and the same are true to my knowledge, except those matters therein which are alleged upon information and belief, and as to those matters, I believe them to be true.  My beliefs, as to those matters therein not stated upon knowledge, are based upon facts, records, and other pertinent information contained in my files.

3.      I make this verification because Plaintifs Woodstock and Narinesammy do not currently reside in the County (Kings) where I maintain my office.

Dated:  Brooklyn, New York
        May 8, 2024

By: _____
    Maryanne K. Kaishian
    **Kaishian & Mortazavi LLC**
    55 Washington Street, Ste. 508
    Brooklyn, New York 11201
    T: (347) 662-2421
    E: mk@kaishianlaw.com

**PLAINTIFF VERIFICATION**

I, **JAHIEM SMITH**, affirm the following to be true under the penalties of perjury:

1.      I am over 18 years of age and am a resident of Kings County, New York.

2.      I am the Plaintiff in the above action, *Woodstock, et al. v City of New York, et al*.

3.      I have read the attached Verified Complaint and am familiar with its contents and underlying events.      This Complaint is dated May 8, 2024.

4.      The facts alleged in this Verified Complaint are true to my knowledge. As to those matters therein which are alleged upon information and belief, I believe them to be true.

Dated: _____05/08/2024_____

Signed: _____

Print: _____Jahiem Smith_____

---

STATE OF NEW YORK          )

                                                  SS.

COUNTY OF KINGS            )

On the __08__ day of ____May____ in the year 2024 before me, the undersigned notary public, personally appeared _____Jahiem Smith_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notarized online using audio-video communication

Maryanne K Kaishian
Online Notary Public
State of New York
Kings County
Commission #: 02KA0015799
Commission Expires: 11/07/2027

_____
Notary Public